UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

DAVID FIACCO,                              )
                                          )
                Plaintiff,                )
                                          )
        v.                                )          Civil No. 1:05-145-GZS
                                          )
SIGMA ALPHA EPSILON FRATERNITY,           )
                                          )
                Defendant.                )


**RECOMMENDED DECISION ON MOTION TO DISMISS**
**AND ORDERS ON MOTION TO STRIKE AND MOTION FOR ORAL ARGUMENT**

David Fiacco filed this civil action against Sigma Alpha Epsilon Fraternity (SAE), Inc.,

an Illinois corporation with a principle place of business in the State of Illinois, asserting a

"prima facie tort" claim along with emotional distress claims premised on the disclosure of

unflattering information concerning Fiacco to the University of Maine President and Board of

Trustees.  Now pending is SAE's Motion to Dismiss for Lack of Personal Jurisdiction.  (Docket

No. 8.)  I recommend that the Court deny the motion.

**Jurisdictional Facts**

When facing a motion to dismiss for lack of personal jurisdiction under Federal Rule of

Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that the court has personal

jurisdiction over the defendant.  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st

Cir. 2001).  When an evidentiary hearing is not held to determine whether personal jurisdiction

exists, the plaintiff must make a prima facie showing of jurisdiction by "citing to specific

evidence in the record that, 'if credited, is enough to support findings of all facts essential to

personal jurisdiction.'" Snell v. Bob Fisher Enter., Inc., 115 F. Supp. 2d 17, 20 (D. Me. 2000) (quoting Boit v. Gar-Tec Prod., 967 F.2d 671, 675 (1st Cir. 1992)).  When determining whether the plaintiff has made the requisite showing, the court considers the pleadings, affidavits, and exhibits filed by the parties.  Snell, 115 F. Supp.2d at 20.  The plaintiff's properly supported proffers of evidence are accepted as true and evidentiary disputes are resolved in favor of the plaintiff.  Favorable inferences may be drawn, provided they are not "farfetched."  Sawtelle v. Farrell, 70 F.3d 1381, 1386 (1st Cir. 1995).  Conclusory allegations are not to be credited.  Id.

The relevant record for the jurisdictional contest consists of the Complaint, the  affidavits of Fiacco and Fiacco's counsel, Bernard J. Kubetz, the affidavits and transcripts of the depositions of James Sexton and Frank Ginocchio, SAE, Inc.'s corporate counsel, and exhibits introduced in connection with the same.  According to Mr. Ginocchio, SAE, Inc. owns no property, conducts no business and supplies no services in Maine.  (Ginocchio Aff. ¶¶ 5-6.)  He describes the relationship between SAE, Inc. (sometimes referred to as "Sigma" or "the national fraternity") and its local chapters as follows, citing Section 45 of SAE, Inc.'s bylaws:

> Sigma may grant a charter to any group of males at any college or university; Sigma provides advice and counsel to local chapters[1]; Sigma is separate and distinct from each local chapter; Sigma has no power to control the activities or operations of any local chapter.
>
> Local chapters, in order to accept charters, agree to comply with the duties and responsibilities upon the chapters as provided in the fraternity laws, including the payment of initiation and pledge fees and annual dues, the submission of reports, and permitting inspection; each chapter makes its own arrangements as to housing or other living quarters, fixes its own dues, assessments and charges, elects its own officers, and has complete control of its own activities; no chapter has any authority to act for or bind Sigma; no chapter is a subsidiary of Sigma.

(Id. ¶¶ 9-10; paraphrasing The Fraternity Laws, Sigma Alpha Epsilon Fraternity 2001 (Bylaws) at 25, ¶ 45, Ginocchio Aff. Ex. 2, Docket No. 20.)  SAE issues charters to local chapters on

---

[1]     This fact appears to conflict with the assertion that SAE, Inc. provides no services in Maine.

university campuses throughout the United States. (Bylaws at 25.) The University of Maine chapter of the fraternity is one of 210 chapters nationwide. (Ginocchio Dep. at 29.) SAE dictates the governance structure of each of its local chapters. (Bylaws at 20 & 34-40.) SAE's bylaws also call for the establishment of geographical districts known as provinces that are governed at the provincial level by a province convention. (Bylaws at 20-24; Ginocchio Dep. at 16-17.) The SAE chapter at the University of Maine is in the alpha province. (Sexton Dep. at 44; Ginocchio Dep. at 54.) Each province is headed up by volunteers, called archons and deputy archons, who are elected by popular ballots cast at a province convention. (Bylaws at 22, § 42(C); Ginocchio Dep. at 19; Ginocchio Dep. Exs. 18, 20, 21.) Although Section 45 of SAE's bylaws specifies that local chapters are "separate and distinct" from "the Fraternity" and that "the Fraternity has no power to control the activities or operations of any chapter" (Bylaws at 25, ¶ 45), there is no similar language distancing the activities and operations of the province convention and province officers from "the Fraternity." In fact, the bylaws specify that province archons must maintain communication with SAE, Inc.'s fraternity service center and supreme council related to the chapters in their given provinces, attend both province and "realm"-wide events, and conduct other SAE business such as ensuring that province officers visit chapters and alumni associations annually and whenever else they are instructed to make visits by the eminent supreme archon, reporting to the eminent supreme archon and the supreme council concerning the same, publishing and enforcing orders from the eminent supreme archon and the supreme council, periodically reporting to the supreme council on the status of the fraternity's ritual at the chapters within his province, maintaining chapter & alumni contact information, maintaining communication with SAE's high performance team (HPT) leaders, regional directors and

province council, and ensuring that a province event is held each year such as a leadership school, convention or sports tournament.  (Bylaws at 22-23, § 43.)

The second in command in each province is the province deputy archon, whose responsibilities are to assist the province archon and perform the duties of the province archon in case of his absence or disability.  (Bylaws at 23, § 43(B).)  James Sexton, a University of Maine graduate, served as deputy archon for the SAE alpha province at all relevant times.  (Sexton Dep. at 17-18.)  In addition to the provincial oversight conducted by the province archon and deputy archon, SAE, Inc.'s executive director, known as the eminent supreme recorder, must visit and inspect the local chapters once every two years or designate someone to make a visit in his stead.  (Bylaws at 9-10, §§ 18(G)(4)(c), 18(G)(6); Ginocchio Dep. at p. 29.)  Other than this requirement in the bylaws, Fiacco has not presented evidence of actual visits occurring pursuant to this provision.  In addition, the bylaws call for the discipline of chapters under certain circumstances.  (Bylaws at 28, § 46(B).)  One disciplinary measure involves a "chapter membership review."  (Id. at 28, § 46(B)(5).)  In 2002, SAE conducted such a membership review of the Maine alpha chapter.  (Ginocchio Dep. at 73 & Ex. 6.)  SAE, Inc. notes that this is the only evidence of any actual direct review of the Maine alpha chapter by officers of SAE's supreme council that exists in the record.  (Def.'s Reply Mem. at 11.)  Upon the granting of a charter, SAE, Inc. furnishes ceremonial "equipment" to its chapters.  (Bylaws at 27, § 46(A)(6).)  SAE, Inc. reserves the right to discipline and terminate its local chapters.  (Id. at 27, § 46(B); Ginocchio Dep. at 42.)  SAE dictates that certain requirements be met in order for students to join a local chapter, including a "course of education" of at least four weeks in duration that involves a curriculum approved by the supreme council.  (Bylaws at 29-30, § 47.)  The national fraternity establishes the dues, fines and fees structure for its local chapters.  It specifies that

monies be paid to the local chapter, the province and the national.  (Bylaws at 33-34, § 48.)

SAE, Inc. collects monies from its local chapters, including the University of Maine chapter, in

the form of charter membership fees, initiation fees, pledge fees, membership fees and risk

management fees.[2]  (Id.; Sexton Dep. at 52-53.)  SAE Services, a non-profit Ohio corporation,

made a loan to the Minerva House Corporation, an affiliate of the local chapter that holds title to

the SAE house at the University of Maine, to fund repairs to the local chapter house, sometime

during the period 2002-2003.[3]  (Ginocchio Dep. at 82-83, 92-93; SAE Dep., Exs. 9, 12.)

In 2001, SAE, Inc. representatives traveled to Maine to attend a SAE leadership retreat at

the University of Maine.  The visit coincided with the fraternity's commemoration of the 100th

anniversary of its presence at the University.  The SAE representatives included Col. Bill Wood,

SAE's eminent supreme archon, Tom Warden, its eminent supreme warden, Tom Goodale, its

eminent supreme recorder, and Dick Hooker, its director of housing.  (Ginocchio Dep. at 38-39,

53-57; Sexton Dep. at 103-105; Sexton Dep. Exs. 7, 8, 11, 15.)  Also in attendance were Kevin

Neumann, archon for province alpha, and James Sexton, deputy archon for province alpha.  (Id.)

As part of their 2001 visit to Maine, the SAE representatives met with members of the University

of Maine administration to discuss the local chapter's ongoing difficulties.  (Sexton Dep. Exs. 11,

---

[2]    Circa 2001 every candidate for initiation was required to pay a $200 initiation fee to the eminent supreme recorder of SAE, Inc.  (Bylaws at 33-34, § 48(A).)  In addition, each chapter was required to pay a $75 pledge fee for each person elected to join the fraternity and a $90 annual due for each active member.  (Id. § 48(B).)  Chapters are also required to procure insurance through SAE, Inc.'s fraternity service center, which "shall arrange for coverage" paid for by each chapter.  (Id. at 36, § 51(G).)

[3]    SAE, Inc. argues that this is not a forum contact of its own, only a contact by the affiliated entity, SAE Services.  Mr. Ginocchio made no such distinction at his deposition, but makes it now by means of a reply affidavit. The SAE bylaws govern the structure of SAE Services and its officers are elected at biennial meetings of the fraternity convention, "the supreme power" of the fraternity, which is comprised of, among others, SAE, Inc.'s officers, as well as province archons and delegates of the local chapters.  (Bylaws at 4, 12-14.)  I credit Mr. Ginocchio's statement as to the separate corporate structure of SAE Services, but I do not conclude that this fact makes the provision of loans to local entities irrelevant to the instant jurisdictional question because it also appears from the record that SAE, Inc. uses its power to revoke charters in order to compel payment of delinquent loans issued by SAE Services and that its counsel, Mr. Ginocchio, provides counsel to SAE Services as well as SAE, Inc. (See Ginocchio Dep. Ex. 12.)  It appears that SAE Services is, among other things, the financial arm of the national fraternity.

12, 15.)  In connection with the ongoing problems the Maine alpha chapter was experiencing during the period 1999 through 2002, SAE, Inc. engaged in communication with the University of Maine administration and indicated that the national fraternity was working with the local chapter to try to resolve the local chapter's difficulties.  (Sexton Dep. Exs. 8, 12, 13, 14; Ginocchio Dep. at 83-84 & Exs. 3, 4, 5, 13, 14, 15, 16.)  Within this timeframe, SAE regularly corresponded with, and provided advice to the local Maine chapter as to how to deal with disciplinary proceedings brought by the University of Maine administration.  (Ginocchio Dep. at 40, 94-97 & Exs. 7, 8, 10, 11, 12, 13.)

In addition to the foregoing contacts with the University, the Maine alpha chapter and individual SAE fraternity members, SAE, Inc. also requires each local chapter to publish an annual newsletter, to elect chapter advisors and to follow certain ritual practices.  (Bylaws at 41, 43, 50-53, §§ 53, 57, 66.)  SAE, Inc. forbids any member from displaying or offering for sale any badges, jewelry or other articles bearing the crest, coat of arms or letters of the fraternity except as authorized by the fraternity's "official jeweler."  (Bylaws at 51, § 67.)  This leaves me to ponder the nature of SAE's merchandising activities within this forum, but the record compiled by Fiacco does not appear to address this matter.[4]  I do note that SAE's internet site includes a marketplace link.  (Ginocchio Dep. Ex. 22.)

Exhibits appended to Mr. Ginocchio's deposition transcript reflect that SAE makes student loans available to some of its members, though the record does not reflect what students in Maine receive or have received student loans from the national fraternity.  (Ginocchio Dep. Exs. 18, 23, 24.)  "Initiated brothers in good standing" can access records and search for contact

---

[4]        Such facts would tend to make the case for jurisdiction over SAE, Inc. stronger.  Compare Truttling v. Omega Psi Fraternity, 1998 Tex. App. LEXIS 6884, *7-*10 (Tex. App. Nov. 3, 1998) (finding exercise of general jurisdiction was warranted based on chartering of ten local chapters, sale of memberships and the collection of annual dues from local members, in state merchandising activity, hosting of local events, and contracts with local vendors).

information concerning other members in the national fraternity and utilize other services such as message boards and job boards available in the members only section of the SAE website.  (Id., Ex. 24.)

Mr. Fiacco's claim arises out of a tactical response certain SAE members and alumni devised in reaction to disciplinary measures that were being prosecuted administratively by Fiacco in his capacity as the University's student conduct officer.  Sometime in the fall of 2002, following an investigation of an event that allegedly transpired on the premises of the Maine alpha chapter house, Fiacco was prosecuting misconduct complaints against the Maine alpha chapter.  While that prosecution was pending, members of the fraternity retained local counsel who hired a private investigator to dredge up unflattering information about Fiacco from the State of Colorado.  (Compl. ¶¶ 7-9.)  Despite the irrelevance of this information to the charges pending against the fraternity, members of the fraternity delivered copies of certain state records to the President of the University of Maine, members of the University's Board of Trustees, various deans, the campus newspaper and the local press.  (Id. ¶ 11.)  An unsigned enclosure memorandum queried, "[i]s this honestly the best qualified candidate that the University of Maine could find for the Office of Judicial Affairs?"  (Compl. Ex. A.)  Fiacco attributes the memorandum and enclosures to SAE, Inc. and alleges that these acts "were intended to discredit [him], improperly influence the prosecution and outcome of the pending charges against SAE Fraternity, harm [his] relationship with [the University of Maine] and the Fraternity in general, and otherwise embarrass and humiliate [him]."  (Id. ¶ 12.)  He asserts two emotional distress claims, a "prima facie tort" and a civil conspiracy theory and requests an award of punitive damages.[5]

---

[5]      SAE, Inc. has not filed a Rule 12(b)(6) motion so I have no occasion to address the viability of these counts.

At his deposition, James Sexton, deputy archon for the alpha province, described himself as "a volunteer for the Sigma Alpha Epsilon Fraternity" and stated that he was "elevated to province deputy archon during his last years as an undergraduate," which role he filled between 1999 and 2004.  Somewhere in that timeframe he also served in a volunteer capacity on "the standing risk management committee to the supreme council," to which he was appointed by SAE's eminent supreme archon.  (Sexton Dep. at 18-20.)  In 2004, after his participation in the activities giving rise to this litigation, SAE elevated Sexton to his current position as province archon for province alpha.  (Id. at 17-18.)  Sexton testified that the decision to mail the memorandum that gives rise to this litigation was made by himself, Jim Dill, Greg Jamieson, Joe Irace and Joe Novack.  (Id. at 72.)  Jim Dill is a faculty member at the University and was an advisor of the Maine alpha chapter.  (Id. at 52; Ginocchio Dep. at 131.)  Greg Jamieson is a former president of the University of Maine Alumni Council and was also an advisor of the Maine alpha chapter.  (Sexton Dep. at 52.)  Joe Irace was the undergraduate president of the Maine alpha chapter at the time.  (Id. at 151.)  Joe Novack was an undergraduate member and officer of the Maine alpha chapter.  (Ginocchio Dep. at 131.)  With regard to Mr. Dill and Mr. Jamieson, as chapter advisors they are expected by the national fraternity to "counsel the chapter in the administration of its affairs and [to] represent the Supreme Council and the Province Archon in perpetuating the Fraternity's standards, policies, and traditions."  (Bylaws at 53, ¶ 57.)  Although elected by the local chapter, they could only obtain their office by approval of the province archon.  (Id.)  The fraternity bylaws state that they were required to visit the chapter twice monthly and to "report to the Eminent Supreme Recorder and the Province Archon any conditions that may need special attention."  (Id.)  Sexton played a role in drafting the memorandum.  (Id. at 78.)  According to him, they sent the materials concerning Fiacco in a box

to Tim Sheehan, another fraternity member who was residing in Colorado, who then forwarded the materials to the intended Maine recipients in envelopes not bearing any return address. (Id. at 74.) Sexton testified that he does not know or recall if any other SAE representatives were consulted with regard to this action. (Id. at 79-80.) He also denied any recollection of how he came to possess a copy of the Colorado documents or what he did with them. (Id. at 70-71.) However, he also testified that he spoke with Goodale, SAE's eminent supreme recorder (executive director), concerning the retention of a private investigator. (Id. at 156-57.) According to Sexton, Goodale wanted Sexton to consider what mechanism existed for lodging a complaint against university officials. (Id. at 157.)

The materials reached the intended recipients sometime in the fall of 2002. (Fiacco Aff. ¶ 4, Docket No. 21; Sexton Dep. at 73-74.) Several months prior, in February 2001, Sexton wrote Dr. Robert Dana, Dean of Student Affairs at the University of Maine, indicating that he was the "New England liaison between Maine Alpha and the national Fraternity," and essentially arguing that the charges against the Maine alpha chapter were unfair or unfounded. (Sexton Dep. Ex. 5.) Later in the month of February 2001 Sexton addressed another student conduct officer and described himself as "an official representative of the national fraternity" and as someone "in a position to guarantee . . . our full and complete cooperation." (Id. Ex. 11 at 5.) He proceeded over the next several months to address various disciplinary matters with Dr. Dana and other student affairs officers, including dissatisfaction with the way Fiacco was handling disciplinary affairs. (Id. Exs. 6-13, 15.) Province archon Kevin Neumann also interceded on SAE's behalf. (Ginocchio Dep. Ex. 5.)

In 2004, SAE "elevated" Sexton from deputy archon to archon for province alpha. (Sexton Dep. at 17-18.) In October 2005, in connection with the University's decision to

withdraw Maine alpha chapter's status as a recognized campus fraternity because of a series of alleged transgressions, SAE, Inc. brought a lawsuit against the University in Maine Superior Court, seeking access to records under the Maine Freedom of Access Statute.  (Ginocchio Dep. at pp. 101-102; Ginocchio Dep., Ex. 17.)  The correspondence SAE Inc.'s counsel sent to the court copied James Dill and James Sexton, but not any of the officers of SAE, Inc., even though SAE, Inc. was the named plaintiff.[6]

### Motion to Strike

Before analyzing the jurisdictional contest, I pause to dispose of SAE, Inc.'s motion to strike.  (Docket No. 26.)  SAE, Inc. moves to strike affidavit testimony offered by David Fiacco and his counsel, Bernard Kubetz, to the effect that both affiants have personal knowledge that the memorandum at issue was received by at least some if the intended recipients at the University.  SAE, Inc. says the affiants could not possibly have personal knowledge that the memorandum was received by anyone at the University because they were not themselves individuals to whom the memorandum was mailed.  (Mot. to Strike at 1-2, Docket No. 26.)  Mr. Fiacco states that a college dean gave him a copy of the memorandum.  This is a sufficient basis from which to infer that the memorandum reached at least one intended recipient.  I also note that the memorandum was an exhibit in the custody of Fiacco that was identified by Mr. Sexton during his deposition.

---

[6]       SAE, Inc.'s lawsuit was filed after this suit was filed and, therefore, the existence of that lawsuit should not be relied upon in the Court's analysis as a relevant forum contact.  See Harlow v. Children's Hosp., 432 F.3d 50, 64-65 (1st Cir. 2005) (citing Noonan v. Winston Co., 135 F.3d 85, 93 n.8 (1st Cir. 1998) (considering facts up to the date the complaint was filed as opposed to the date the underlying tort occurred and not specifically addressing the question of whether post-complaint contacts should inform the general jurisdiction inquiry) and Swiss Am. Bank, 274 F.3d at 619 n.4 (citing Noonan to explain its disregard of forum contacts arising after the filing of the complaint although Noonan did not in fact present the issue)).  I have included the fact of the 2005 freedom of access lawsuit for purposes of emphasizing that James Sexton, although not an officer of SAE's supreme council, was copied with litigation correspondence, whereas none of SAE Inc.'s officers were.  In my view, this fact is circumstantial evidence of the important official functions that provincial officers serve for the national fraternity with regard to local affairs, which is relevant to the inquiry whether Mr. Sexton's activities can fairly be attributed to the defendant in this suit.

The request to strike Fiacco's affidavit testimony is overruled.  Attorney Kubetz's related testimony is cumulative and the request to strike his testimony is overruled as moot.

SAE, Inc. also moves to strike certain exhibits because they show highlighting and are therefore, it argues, not in compliance with Rule 403 of the Federal Rules of Evidence.  (Mot. to Strike at 2-3.)  Other than the reference to Rule 403 there is no briefing concerning the legal basis for this objection.  Because I discern no basis for prejudice, confusion or waste of time in the exhibits, I overrule the objection.

SAE, Inc. next moves to strike exhibit 17 from the Sexton deposition.  (Id. at 3.)  I independently declined to incorporate this document into my factual findings because its relevance escaped me.  Nevertheless, I will sustain the objection because I see no good reason to deny SAE, Inc.'s objection.

SAE, Inc. also wishes to have the Court strike exhibit 17 from the Ginocchio deposition. Exhibit 17 is a copy of the freedom of access complaint filed by SAE, Inc. in Maine Superior Court after the commencement of this litigation.  (Id. at 3.)  According to SAE, Inc., the Court may not consider this document because it came into existence after the commencement of this litigation and therefore cannot be considered a material forum contact for purposes of the minimum contacts analysis.  I overrule the request to strike the exhibit because the document has independent significance as circumstantial evidence of James Sexton's stature as an agent of SAE, Inc.

### Motion for Oral Argument

SAE, Inc. has submitted a motion for oral argument concerning its motion to dismiss. (Docket No. 27.)  Fiacco opposes the motion.  (Docket No. 29.)  I conclude that the papers are sufficient to permit the Court to make a ruling on the basis of a prima facie analysis of the

jurisdictional question.  I have declined to entertain oral argument, but SAE, Inc. is free to

submit a renewed motion for oral argument in the context of an objection to my recommended

decision.  The motion for oral argument is denied.

### Motion to Dismiss

The Court recently outlined the personal jurisdiction test applied in diversity suits:

> The personal jurisdiction of a federal court sitting in diversity is equivalent to that
> of a state court sitting within the forum.  Nowak v. Tak How Invs., Ltd., 94 F.3d
> 708, 712 (1st Cir. 1996).  Thus, to establish personal jurisdiction over Defendant,
> Plaintiff must demonstrate both that Maine's long-arm statute grants jurisdiction
> and that exercise of jurisdiction under the statute is consistent with the Due
> Process Clause of the United States Constitution.  Daynard v. Ness, Motley,
> Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002).  Because
> Maine's long-arm statute is coextensive with the permissible exercise of personal
> jurisdiction under the Constitution, the due process inquiry controls in the present
> case.  See 14 M.R.S.A. § 704-A (Supp. 2003); Murphy v. Keenan, 667 A.2d 591,
> 593 (Me. 1995).  Two means of establishing jurisdiction over Defendant's person
> are available under the Fourteenth Amendment: specific and general jurisdiction.

Heller v. Allied Textile Cos., 276 F. Supp. 2d 175, 182 (D. Me. 2003).  General jurisdiction

refers to an exercise of personal jurisdiction premised on the fact that the defendant has

continuous and systematic contacts with the forum state, whereas specific jurisdiction refers to

an exercise of jurisdiction premised on the fact that the lawsuit at issue arises directly out of the

defendant's contacts with the forum state, even though the defendant is not otherwise within the

general jurisdiction of the forum state.  Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 135

(1st Cir. 2006).  In either situation, the non-resident defendant's forum contacts must be

purposeful in order to justify an exercise of personal jurisdiction.  Id.  Finally, even if the

defendant's forum contacts are purposeful, there are certain circumstances in which an exercise

of personal jurisdiction over the defendant will not be reasonable or, alternatively stated, will be

inconsistent with "traditional notions of fair play and substantial justice."  N. Laminate Sales,

Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

General jurisdiction exists when the defendant maintains "continuous and systematic general business contacts" with the forum. Helicopteros Nationales de Columbia, S.A. v. Hall, 466 U.S. 408, 416 (1984). As it sounds, the "continuous and systematic" standard "is considerably more stringent" than the otherwise innocuous sounding "minimum contacts" standard. Platten, 437 F.3d at 138 (quoting Noonan v. Winston Co., 135 F.3d 85, 93 (1st Cir. 1998) and Glater v. Eli Lilly & Co., 744 F.2d 213, 216 (1st Cir. 1984)). This is so because the implications of general jurisdiction are considerable. An exercise of general jurisdiction over a defendant reflects that the non-resident defendant could be subject to suit in the forum based on potentially any claim brought by potentially any plaintiff. Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999) ("[A] defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum."). Of course, this is only the case where traditional notions of fair play and substantial justice do not dictate otherwise. To evaluate whether such notions do preclude a court from exercising jurisdiction over the person of a non-resident defendant, the Supreme Court has prescribed five "gestalt factors" to consider. United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St., 960 F.2d 1080, 1088 (1st Cir. 1992). These gestalt factors are (1) the defendant's burden of appearing; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the

shared interest of the several states in promoting substantive social policies.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).

Even when a non-resident defendant does not maintain continuous and systematic contacts with the forum, a court within the forum may still exercise personal jurisdiction over the defendant "if [the] case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum."  Phillips Exeter Acad. V. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999).  This is what is meant by specific jurisdiction.  N. Laminate Sales, 403 F.3d at 24.  For specific jurisdiction to arise, the plaintiff's claim must be related to purposeful forum contacts by the defendant.  Harlow, 432 F.3d at 57.  As with general jurisdiction, the exercise of specific jurisdiction in each case must also be reasonable in light of the Supreme Court's gestalt factors.  Id.  I address the two minimum contacts tests first and then consider whether this case meets the reasonableness requirements of the Due Process Clause.

## A.    Minimum contacts and general jurisdiction

It is well established that even close affiliation between an out-of-state corporation and an in-state corporation will not justify an exercise of jurisdiction over the out-of-state corporation based on the in-state corporation's contacts with the state.  Id.  In fact, even in the case of a parent-subsidiary relationship there is a "presumption of corporate separateness."  Id.  Moreover, the First Circuit Court of Appeals has held that even relatively frequent commercial contacts by an out-of-state entity with entities inside the forum state will not satisfy the constitutional requirements of the general jurisdiction test when those contacts involve only advertising activities and the sale of products to in-state distributors (as opposed to direct sales to consumers), even if the defendant maintains sales representatives inside the forum.  See Noonan v. Winston Co., 135 F.3d 85, 93 (1st Cir. 1998) (discussing precedent, including Glater v. Eli

Lilly & Co., 744 F.2d 213 (1st Cir. 1984), and Donatelli v. Nat'l Hockey League, 893 F.2d 459

(1st Cir. 1990)); see also Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-

418 (1984) (holding that general jurisdiction did not exist over foreign corporation that sent its

CEO to forum state for contract negotiation and other personnel for product training sessions);

Seymour v. Parke, Davis & Co., 423 F.2d 584, 586-87 (1st Cir. 1970) (holding that where

"defendant's only activities consist of advertising and employing salesmen to solicit orders, . . .

fairness will not permit a state to assume jurisdiction.").  If the analogy of sales where

superimposed on this case, the local chapters would essentially amount to sales and marketing

affiliates of SAE, Inc.  In this light, both the local chapter and the national would be viewed as

engaged in selling membership, but at the local level it would be primarily the local chapter's

conduct that establishes the actual contacts with pledges and members in the forum.  On the

other hand, in the context of partnerships or joint ventures, "the activities of the partner are

generally attributed to the partnership and jurisdiction over the partnership follows from the

partner's contacts, if sufficient, regardless of the absence of independent contacts between the

partnership qua entity and the forum."  Daynard, 290 F.3d at 54.  In many ways, SAE, Inc.'s

cooperation with the Maine alpha chapter in regard to the fraternity's presence in Maine has more

in common with a partnership than it does with mere corporate affiliates or non-resident

manufacturers and resident distributors engaged in independent business enterprises.  After all,

the "chapter," "province" and "national" terminology is itself suggestive of one large and

integrated entity and the local chapter is essentially pledging prospective members and collecting

pledge and membership fees on behalf of the national organization.  With regard to such

organizational activity the national and the local are essentially pursuing a joint venture for their

common benefit.  With respect to those activities, then, it might be reasonable to attribute the

forum contacts of the local chapter to the national entity.  For purposes of the general jurisdiction analysis, Fiacco has not really argued Maine alpha chapter's continuous and systematic forum contacts should be attributed to SAE, Inc. and I am not persuaded that the attribution approach is really appropriate in this context.  I return to the attribution question in the context of the specific jurisdiction analysis.

Additional circuit precedent instructs that even where an out-of-state defendant maintains its own direct contacts with numerous individual residents of a state, or with the state itself, general jurisdiction still may not exist.  Thus, in <u>Harlow v. Children's Hosp.</u>, 432 F.3d 50, 58 (1st Cir. 2005), the Court of Appeals held that general jurisdiction did not lie over an out-of-state hospital where Maine residents regularly visited the hospital for care.  <u>Harlow v. Children's Hosp.</u>, 432 F.3d 50, 58 (1st Cir. 2005).  This was so even though the hospital established a relationship with the State of Maine in order to obtain payments through Maine Medicaid, engaged in various correspondence and telephone communications in connection with its treatment of the plaintiff and engaged in marketing activities to inform in-state doctors of the services the hospital could provide.[7]  <u>Id.</u> at 58-60, 65-66.  Relying on the sales and marketing precedents outlined above, the Court discounted the hospital's advertising activity, describing the case as having "an essentially similar fact pattern" as its other sales and marketing cases.  <u>Id.</u> at 66.  Thus, despite the fact that SAE has direct forum contacts in relation to its sale of memberships to University of Maine students for more than 100 years, including its receipt of funds from pledges and various other dues and fees, that does not automatically confer personal jurisdiction over SAE, Inc. in regard to unrelated claims.

---

[7]     The <u>Harlow</u> Court observed that the record could not support the plaintiff's contention that the hospital had maintained a relationship with Maine Medicaid for a period of decades and regularly submitted documents to the State to maintain its enrollment as an approved provider under the program.  432 F.3d at 58 n.5.

SAE, Inc. contends that the facts set forth on the record in this case fall within the protective penumbra that emanates from Harlow and the Noonan line of cases.  Fiacco argues that this case is more like Stier v. Girl Scouts, 218 F. Supp. 2d 58 (1st Cir. 2002), in which the United States District Court of the District of New Hampshire held that the Girl Scouts of the United States of America (GSUSA), a federally-chartered, non-profit membership organization, was subject to the general jurisdiction of New Hampshire courts because of the existence of the following facts:

    a.    "GSUSA exists for the purpose of recruiting members and having them participate in activities that are governed by guidelines it sets."

    b.    "GSUSA conducts extensive reviews of regional councils on a regular basis, and revokes or qualifies charters if the councils are not maintaining enough members or adhering to guidelines."

    c.    "GSUSA has the exclusive rights to badges, emblems, words and phrases associated with the Girl Scouts, . . . which it permits regional councils and local troops to use only after confirming that these entities comply with GSUSA's standards."

    d.    "Without GSUSA's permission to associate itself with the 'Girl Scouts,' undoubtedly Spar & Spindle would not attract and keep anywhere near as many members."

Id. at 64.  In most of these respects, the SAE fraternity is just like the Girl Scouts of America.  In fact, the only comparison that SAE, Inc. takes issue with is whether it "conducts extensive reviews of regional councils on a regular basis" for purposes of evaluating whether to revoke or sustain the local's charter.  According to SAE, Inc., "[o]nly one representative of SAE, Inc.[, the eminent supreme recorder,] is required to visit local chapters, and then only once every two years."  (Def.'s Reply Mem. at 13; see also Bylaws at 9, ¶ 4(c).)  By comparison, I note that the court in Steir found that GSUSA conducts reviews of its charters every *four* years.  Steir, 218 F. Supp. 2d at 61.  Moreover, the record reflects that SAE, Inc. has had contacts with the University

of Maine's Orono chapter for over 100 years.  There was no evidence of such a longstanding forum contact in the Steir case.  SAE responds that its periodic review of the Maine alpha chapter should not be given any weight because, even though it "reserves the right to withdraw a charter [from] a local chapter," it has not exercised that right and therefore has not caused such a forum contact to occur.  (Def.'s Reply Mem. at 14.)  I can appreciate this point, which is why I consider the regular review of the local chapter every two years to be the relevant contact, not the non-exercise of the right to revoke the local chapter.  In my view, this case is on par with Steir, which I consider to be persuasive precedent.[8]  Accordingly, based primarily on the quality of SAE, Inc.'s longstanding recruitment of members in Maine and receipt of dues from Maine residents for over 100 years, its ongoing review of its Maine alpha chapter over that timeframe, the intercession of provincial volunteers and national officers on behalf of the local chapter when behavioral sanctions are imposed by the University that threaten the continued existence of, or recognition of, the fraternity, its retention of exclusive rights over the distribution of SAE badges, jewelry and related articles that (I infer) are sold to Maine resident members of the SAE fraternity and the fact that the existence of the national entity is fundamental to the existence of the local entity, I conclude that SAE, Inc. has sufficient minimum contacts (i.e., continuous and systematic contacts) to make the exercise of general jurisdiction turn on a consideration of the "gestalt" factors, which are addressed in section C below.

## B.     Minimum contacts and specific jurisdiction

The Court of Appeals has observed that, in some situations, it may be appropriate to impute to an out-of-state defendant the activities of its in-state affiliate, despite the absence of an "actual partnership," such as where the "relationship between the defendants . . . invokes certain

---

[8]     The Court of Appeals affirmed an entry of judgment in the Steir case on grounds other than the personal jurisdiction question, without taking issue with the District Court's ruling that it had jurisdiction over the GSUSA. Steir v. Girl Scouts of the USA, 383 F.3d 7 (1st Cir. 2004).

principles of the law of agency, partnership, and joint venture and . . . these principles permit imputing contacts without the need to show substantial influence."  Daynard, 290 F.3d at 54 (cautioning, however, that this approach should be questioned in the context of a general jurisdiction analysis).  I conclude that this case presents an appropriate situation in which to impute the claim-related actions of Mr. Sexton to SAE, Inc.

Fiacco contends that specific jurisdiction exists in this case because the individuals involved in sending materials to the university president and board of trustees included "SAE representatives."  (Pl.'s Response Mem. at 12, Docket No. 18.)  Fiacco argues that Jim Dill and Greg Jamieson, both Maine alpha chapter advisors, acted as agents of SAE fraternity as a matter of law because the fraternity bylaws require that the local chapters have advisors.  I am not entirely persuaded by this reasoning.  However, Fiacco also argues that James Sexton, then deputy province archon, was an agent of the national fraternity whose purposeful forum contacts directly relate to this litigation.  (Id. at 12-13.)  I find this argument more persuasive, despite the fact that there is nothing in the record that was authored by an officer of SAE, Inc. that reflects an express grant of authority to Sexton to disseminate unflattering materials about Fiacco to university officials.  (See Def.'s Reply Mem. at 20.)

In Daynard, the Court of Appeals held that a plaintiff need not demonstrate that a non-resident exercised "substantial influence" over an associated resident entity in order to attribute the resident's contacts to the non-resident defendant.  290 F.3d at 54.  Particularly in the partnership context, the resident partner's contacts and activities are generally attributable to the partnership for jurisdictional purposes.  Id.  Under the specific circumstances of this case, where James Sexton, a province officer, actively intervened in and responded to local disciplinary measures taken by the University against the Maine alpha chapter, describing his role as that of

19

an intermediary between the local and national fraternity and as that of a national representative, his activities can fairly be attributed to the national fraternity under the prima facie standard.  In addition to this apparent authority, the record is sufficient to support an inference that SAE, Inc. was on notice of the specific activities from which this suit arises.  The record reflects that SAE's eminent supreme recorder knew that a private investigator had been retained to uncover dirt on Fiacco and even advised Sexton to look into what mechanisms existed for filing a complaint against Fiacco.  One might well infer that the anonymous letter campaign was the product of this particular assignment.  When these facts and circumstances are viewed in the light most favorable to Fiacco and are superimposed on the provisions of the bylaws that require provincial officers to report to the national fraternity, the shared organizational goals of the supreme council, province council and Maine alpha chapter with regard to the disciplinary proceedings occurring at the University of Maine and the control exercised over province officers by officers of SAE's supreme council,[9] it is fair to infer that Sexton's claim-related activities were likely known to SAE's national leadership and were within its power to control.  Under such circumstances, those activities are fairly attributable to SAE, Inc. in the same manner as the acts of an agent would be attributed to its principal or the acts of a partner would be attributed to a partnership.  Because this anonymous letter campaign is the precise forum contact from which this litigation arises, it meets the minimum contacts requirement of due process.

---

[9]        The fraternity bylaws and other exhibits in the record reflect a national organization that relies largely on provincial officers like Sexton to oversee, supervise, intervene and liaison for the national fraternity in matters impacting the national fraternity at the local level.  Although the trunks, limbs and branches of the entity that is the "national fraternity" may be separately incorporated, they all serve the most basic objective of preserving and expanding the size and reach of the national fraternity and protecting local chapters from disciplinary actions injurious to the fraternity's standing on campus and its related recruitment efforts.

**C.    Reasonableness**

Although a non-resident defendant has sufficient contacts so that an exercise of personal jurisdiction would not offend the "minimum contacts" requirement of the Due Process Clause, a court must refrain from exercising jurisdiction when it would be contrary to our national concept of fair play and substantial justice, as informed by consideration of the five gestalt factors previously listed.  I conclude that these factors favor an exercise of jurisdiction by this court because Maine clearly is the only state with an appreciable interest in adjudicating the kind of claims alleged by Fiacco, a Maine resident, concerning activity directed toward other Maine residents and impugning the character and qualifications of a state employee.  This interest and Fiacco's obvious personal interest in obtaining convenient and effective relief (assuming it is available) are not outweighed by SAE, Inc.'s burden of appearing in this forum.  In addition to SAE, Inc.'s demonstrated willingness to file other litigation in the Maine forum, SAE, Inc. maintains important ongoing business interests in this forum by virtue of its affiliation with the 100-year-old Maine alpha chapter, which relationship relates directly to this particular litigation, making it unreasonable for SAE, Inc. to expect to escape the reach of Maine courts on a claim of this nature.

**Conclusion**

For the reasons set forth above, I **RECOMMEND** that the Court **DENY** the Defendant's Motion to Dismiss (Docket No. 8).  The Motion to Strike (Docket No. 26) is **OVERRULED IN PART** and **SUSTAINED IN PART**.  The Motion for Oral Argument (Docket No. 27) is **DENIED**.

CERTIFICATE

Any objections to this Order regarding the Motion to Strike or the Motion for Oral Argument shall be filed in accordance with Fed. R. Civ. P. 72.

21

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

March 31, 2006                          /s/ Margaret J. Kravchuk
                                        U.S. Magistrate Judge