# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID FIACCO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:05-cv-145-GZS |
| | ) | |
| SIGMA ALPHA EPSILON FRATERNITY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant's Motion for Summary Judgment (Docket # 54). Through this Motion, Sigma Alpha Epsilon Fraternity ("SAE") seeks summary judgment on all counts alleged by Plaintiff David Fiacco arising out of the distribution of a memorandum and various documents in the fall of 2002. After reviewing the parties' submissions, the Court GRANTS the Motion for the reasons explained below.

## I.      BACKGROUND

Plaintiff David Fiacco was hired by the University of Maine in Orono as the Director of Judicial Affairs in 2001. Fiacco was responsible for overseeing the process through which allegations of student misconduct were investigated, adjudicated and potentially sanctioned. Fiacco had the capacity to investigate allegations of student misconduct, adjudicate cases, conduct hearings himself and prescribe sanctions or refer a case to a committee for its action. In addition, as Director of Judicial Affairs, Fiacco helped develop policy statements regarding the student code of conduct for the University. Prior to his employment at the University of Maine, Fiacco served as a

Judicial Affairs Counselor at Syracuse University and as the Director of Public Safety at Fort Lewis College in Durango, Colorado.

Defendant SAE is a national fraternity, incorporated in Illinois. There are approximately 210 local chapters of Sigma Alpha Epsilon. The local chapter of SAE at the University of Maine in Orono is known as Maine Alpha.[1]

In addition to the national fraternity and local chapter, several individuals played a prominent role in the events that underlie this litigation. Jay Sexton is an alumnus of the University of Maine and the Maine Alpha chapter of SAE and was the Province Deputy Archon during the relevant time period.[2] James Dill was a faculty advisor to the Maine Alpha chapter of SAE, and Gregory Jamison was a volunteer advisor to the Maine Alpha chapter of SAE. Joseph Irace was the President of SAE's Maine Alpha chapter from spring 2001 through spring 2002. Anthony Nowak took over as President in the spring of 2002.

In the spring of 2002, the Maine Alpha chapter of SAE was being prosecuted for violations of the student code of conduct at the University. Fiacco, as the Director of Judicial Affairs, was in charge of investigating and processing the allegations on behalf of the University. Attorney N. Laurence Willey, Jr. was retained to aid in the defense of Maine Alpha. Willey, in turn, retained a private investigator, Victor Kraft, to look into Fiacco's background. While it is unclear who instructed Kraft or exactly how he was instructed, a small group, consisting of Sexton, Dill, Irace, Jamison and Nowak, met with

---

[1] The local chapters of Sigma Alpha Epsilon are organized by the national fraternity into geographic areas called provinces. There are thirty provinces, which are divided into eight regions. The Alpha province of Sigma Alpha Epsilon consists of Rhode Island, Connecticut, Massachusetts, Vermont, New Hampshire and Maine.

[2] The Province Deputy Archon is elected by the local chapters, the alumni associations, and prior province archons in a given province.

Kraft and Wiley in the spring of 2002. Private Investigator Kraft then gathered the various documents.

These documents consisted of publicly available court documents and newspaper articles. The first set of court documents detail Weaver v. Fiacco, a legal proceeding that occurred in Colorado. Through this proceeding, Kelly Weaver, Fiacco's former girlfriend, sought and obtained a temporary and then a permanent restraining order against David Fiacco pursuant to the Colorado Domestic Abuse Act, §14-4-101 et seq.[3] The second set of court documents and two newspaper articles discuss Fiacco's conviction of Driving While Ability Impaired (DWAI), where he had a blood alcohol content of .089 percent. Two additional newspaper articles reveal Fiacco's dismissal from his employment as director of public safety at Fort Lewis College in Colorado.

These documents were provided to Sexton, Dill, Irace, Jamison and Nowak.[4] The group then decided to distribute the documents to select individuals and newspapers within the University of Maine community. The group collaborated to draft a cover memorandum, which read:

> Enclosed please find newspaper articles and court documents detailing Mr. Fiacco's previous legal difficulties: DWI, Sexual Harassment, and Domestic Violence. Is this honestly the best qualified candidate that the University of Maine could find for the Office of Judicial Affairs?

(emphasis in original). The documents were placed behind the memorandum and into plain manila envelopes, bearing no return address. The envelopes were then placed in a box and sent to an alumnus of Maine Alpha in Colorado. The alumnus then placed the envelopes in the mail to be sent to multiple recipients in the Maine. Peter S. Hoff, then-President of the University of Maine, the Board of Trustees of the University of Maine

---

[3] The issuance of the permanent restraining order was overturned on appeal.
[4] While the documents were made available to SAE, it is unclear exactly when that occurred.

System, Dean Dwight Rideout, the Bangor Daily News and the Maine Campus all received a manila envelope containing the memorandum and documents. At the time the memorandum and documents were sent, proceedings continued against Maine Alpha, but Fiacco had been recused from participating in the proceedings.

Before the dissemination of the memorandum and documents, Fiacco had been a social person who enjoyed spending time with his family and friends. After Fiacco learned of the dissemination, he preferred to be alone, avoiding family and friends, and he became depressed. Fiacco's feelings of confidence and self worth were affected as he constantly expected that the information contained in the memorandum and documents would be raised at his work. The stress began to affect Fiacco's work performance, and he began taking time off of work. He also had difficulty with insomnia, nightmares and teeth-grinding. Fiacco ultimately sought professional psychological counseling. Both Dr. Peter Ippoliti and Dr. Polly Moutevelis-Burgess, treating psychologists, believed Fiacco experienced significant stress that required ongoing treatment. Nonetheless, Fiacco remains in his position as the Director of Judicial Affairs at the University of Maine in Orono.

On September 15, 2005, Plaintiff David Fiacco filed a five count complaint naming SAE as Defendant (Docket # 1). The complaint asserts causes of action for intentional infliction of emotional distress (Count I), civil conspiracy (Count II), prima facie tort (Count III), negligent infliction of emotional distress (Count IV) and punitive damages (Count V). On October 12, 2006, SAE moved for summary judgment on all counts (Docket # 54). On January 19, 2007, the Court issued an order requesting additional briefing on the question of whether the First Amendment precludes recovery

on the claim of intentional infliction of emotional distress (Docket # 86). After receiving this briefing, the Court heard oral argument on March 23, 2007 (Docket # 96). With the benefit of the additional briefing, extensive discovery and oral argument, the Court now considers the Motion for Summary Judgment.

## II.    STANDARD OF REVIEW

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the

nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## III.   DISCUSSION

Initially, the Court pauses to note a pervasive legal question in this litigation: whether the relationship between SAE and Maine Alpha and/or any one of the individuals involved is sufficient to establish an agency relationship and thus render SAE liable for the acts of an individual or group of individuals.  See, e.g., Peoples Heritage Savings Bank v. Pease, 797 A.2d 1270, 1275-76 (Me. 2002).   For purposes of the pending Motion, the Court assumes without deciding that a sufficient agency relationship exists to render SAE liable for the acts of the individuals involved.  With this assumption in place, the Court proceeds to consider each of Plaintiff's five claims.

### A.   Intentional Infliction of Emotional Distress

Plaintiff's first count asserts a claim for intentional infliction of emotional distress.   Under Maine law,[5] in order to establish a claim for intentional infliction of emotional distress, the plaintiff must present facts to establish the following four elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [their] conduct; (2) the conduct was "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;" (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable person could be expected to endure it."

---

[5] The parties agree that Maine law controls in this case.

Curtis v. Porter, 784 A.2d 18, 22-23 (Me. 2001) (quoting Champagne v. Mid-Maine Medical Ctr., 711 A.2d 842, 847 (Me. 1998)).  Before deciding whether any genuine issues of material fact exist with respect to these elements, the Court considers the applicability of the protections of the First Amendment to this case.

Generally, state courts are free to define the contours of common law torts, such as intentional infliction of emotional distress.  Nonetheless, the Court is obligated to consider potential limitations on common law causes of action that may conflict with the First Amendment of the Constitution.  The Supreme Court has recognized that speech on matters of public concern, including speech involving individuals in the public eye, must be protected from causes of action that could chill speech.  See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46, 56 (1988) (requiring that actual malice be proved by public officials and public figures to recover for the tort of intentional infliction of emotional distress); New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) ("The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not.").

Thus, where a public official or public figure is the plaintiff in a case seeking damages for intentional infliction of emotional distress, the Supreme Court has stated:

> "Outrageousness" in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression.  An "outrageousness" standard thus runs afoul of our long standing refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience.

Hustler Magazine, 485 U.S. at 55.  As a result, in addition to the common law requirements for intentional infliction of emotional distress, a public official or public figure "may not recover for the tort of intentional infliction of emotional distress by reason of publications . . . without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true."  Id. at 56. This application of the New York Times standard is "necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment."  Id.; see also New York Times Co., 376 U.S. at 279-80.

Therefore, the first task for the Court is to determine whether Fiacco is a public official or public figure.  See Rosenblatt v. Baer, 383 U.S. 75, 88 (1966) (stating that "it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official'"); Norris v. Bangor Publ'g Co., 53 F. Supp. 2d 495, 502 (D. Me. 1999).  Whether an individual is a public official or a public figure is necessarily a detailed, fact specific determination.  Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006).  Nonetheless, because a plaintiff's status controls whether he or she must prove actual malice, it is reasonable to attempt to determine the status through pretrial proceedings.  Id.  This public official/public figure inquiry focuses on the period of time prior to the publication of the statements in question.  Norris, 53 F. Supp. 2d at 503.

### i.     Public Official

Not every public employee is a "public official" for First Amendment purposes, Mandel, 456 F.3d at 202, but the designation applies "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial

responsibility for or control over the conduct of governmental affairs." Rosenblatt, 383 U.S. at 85. The First Circuit has developed three factors for courts to consider when determining how far down the bureaucratic ladder the designation of public official applies. See Kassel v. Gannett Co., 875 F.2d 935, 939-40 (1st Cir. 1989) (referring to the three considerations as a "Three-Legged Stool"). Thus, courts must evaluate: "(i) the extent to which the inherent attributes of a position define it as one of influence over issues of public importance; (ii) the position's special access to the media as a means of self-help; and (iii) the risk of diminished privacy upon taking the position." Mandel, 456 F.3d at 204.

The first factor recognizes that there is "a strong interest in debate about those persons who are in a position significantly to influence the resolution of [public] issues." Rosenblatt, 383 U.S. at 85. While policymakers, upper-level administrators and supervisors may be included as public officials, those whose "government posts entail[] no particular responsibility for governance are likely to slip between the strands." Kassel, 875 F.2d at 939. The underlying rationale is that "such plenipotentiaries occupy niches of 'apparent importance' sufficient to give the public 'an independent interest in the qualifications and performances [sic] of the person[s] who hold[] [them], beyond the general public interest in the qualifications and performance of all government employees.'" Id. (quoting Rosenblatt, 383 U.S. at 86).

In determining whether Fiacco occupied a position of influence over issues of public importance, the Court must focus on the inherent attributes of the position. Id. Fiacco was the Director of Judicial Affairs at the University of Maine in Orono. Through this position, Fiacco was in charge of investigating and processing allegations of

violations of the student code of conduct on behalf of the University.  He had the ability

to adjudicate cases personally and to issue disciplinary sanctions.

In Levinsky's Inc., v. Wal-Mart Stores, Inc., the First Circuit discussed what

qualifies as a matter of public concern in the context of the Constitutional prohibition on

presumed or punitive damages absent actual malice:

> The Supreme Court has roughly bisected the sphere of social commentary
> between matters of public concern, which are those that can be 'fairly
> considered as relating to any matter of political, social, or other concern to
> the community," and matters of private concern, which are those that
> address "matters only of personal interest." . . . [T]he relevant community
> need not be very large and the relevant concern need not be of paramount
> importance or national scope. Rather, "it is sufficient that the speech
> concern matters in which even a relatively small segment of the general
> public might be interested."

Levinsky's, Inc. v. Wal-Mart Stores, 127 F.3d 122, 132 (1st Cir. 1997) (internal citations

omitted).  As the Director of Judicial Affairs, Fiacco drafted policies regarding student

conduct for the University, which included the parental notification policy, the protocol

for notification of university personnel and the guide to standard sanctions.  In the

community of the University of Maine at Orono, the Director of Judicial Affairs wields

significant power and influence over the policies that delineate appropriate behavior and

the consequences for violation of the code of conduct.  Thus, student conduct and the

person responsible for administration of the student code of conduct are important to the

University community.

In countering that he is a public official, Fiacco asserts that he was supervised by

a Dean of the University and that his decisions could be appealed to a committee.

Nonetheless, the record before the Court shows that Fiacco's decisions were final in all

but a small minority of cases.  In 2001, "Fiacco estimated there were about 1000

violations of the code last year.  Only twelve appeals went before the Student Conduct Code Committee."  Aimee Dolloff, <u>Students Held to Higher Standard: Conduct Code, Judicial Affairs Judge Students' Actions</u>, Maine Campus, Nov. 5, 2001 (Docket # 89-6).[6] As the Director of Student Judicial Affairs, Fiacco was charged with enforcing the code of conduct and possessed discretion in executing this charge.[7]

Similarly, in <u>Grossman v. Smart</u>, a federal district court deemed the Vice Chancellor for Research and for Graduate College and assistant to the Chancellor of the University a public official while noting that this plaintiff was also the Hearing Officer in an administrative grievance hearing.  <u>Grossman v. Smart</u>, 807 F. Supp. 1404, 1408 (C.D. Ill. 1992).  Here Fiacco possessed discretion, influence and power in the community of the University of Maine at Orono.[8]  Furthermore, the feedback Fiacco received from his supervisor specifically recognized him as an administrator and leader in the community. Given the influence Fiacco possessed as the Director of Judicial Affairs, the position was one where "the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees . . . ."  <u>Rosenblatt</u>, 383 U.S. at 86.  Therefore, the first factor tends to support a finding that Fiacco is a public official.

---

[6] A slightly different calculation was provided in 2002.  "Each year Fiacco's office handles about 700 cases.  Last year, 18 went to the conduct committee either because of their complicated nature or because they were appealed by student defendants."  Ruth-Ellen Cohen, <u>Football Suspensions Put UM Panel in Spotlight</u>, Bangor Daily News, Oct. 7, 2002 (Docket # 89-13).

[7] In <u>Gomes v. University of Maine System</u>, this Court found that Fiacco was immune from personal liability because he had performed a discretionary function or duty under 14 M.R.S.A. § 8111(1)(C). <u>Gomes v. Univ. of Maine Sys.</u>, 365 F. Supp. 2d 6, 42 (D. Me. 2005).  Specifically, the Court stated: "Investigating a student disciplinary complaint, conducting a disciplinary hearing, and issuing a decision would seem by the nature of the activity not to be ministerial duties, to require the exercise of discretion, and to be within the scope of the official's legal authorization."  <u>Id.</u>

[8] This case stands in contrast to the position of Veteran's Affairs Staff Psychologist considered in <u>Kassel v. Gannett Co.</u>, where the First Circuit stated: "He (the plaintiff) did not routinely supervise, manage, or direct government operations.  He did not formulate policy.  He did not govern; Kassel was a clinician whose work, by and large, was confined to seeing patients and administering tests."  <u>Kassel</u>, 875 F.2d at 940.

Second, the Court must consider "the position's special access to the media as a means of self-help." Mandel, 456 F.3d at 204. The First Circuit has recognized that "[t]hose who hold public office are frequently able to defend themselves in the media. That ability is tantamount to the ability to engage in self-help." Kassel, 875 F.2d at 939; see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974). Because public officials have a greater ability to counteract any negative publicity, the state has a correspondingly diminished interest in protecting the individual. See Kassel, 875 F.2d at 940. In considering whether Fiacco maintained access to the media, bootstrapping is not permitted: media access as a result of this litigation will not suffice to make Fiacco a public official. See id. at 941. Thus, the Court limits its consideration to media exposure that occurred at the time of or prior to the publication of the memorandum and documents in question.

In the span of ten months, from October of 2001 through August of 2002, Fiacco appeared in the Maine Campus five separate times, all in relation to his position as Director of Judicial Affairs. It is unclear whether he contacted the newspaper or the newspaper contacted him with regard to these articles. Nonetheless, it is clear from this recurrent exposure that his position entailed contact with the media, frequently to explain the functions of his office and the sanctions imposed on members of the community. An article from November 5, 2001 states:

> Fiacco said all students are treated equally under the code – athletes, members of the Greek community and other prominent students and organizations on campus – are all under the same jurisdiction and rules as everyone else.

Aimee Dolloff, Students Held to Higher Standard: Conduct Code, Judicial Affairs Judge Students' Actions, Maine Campus, Nov. 5, 2001 (Docket # 89-6). In addition, it is

-12-

apparent that the nature of Fiacco's office included a public advocacy and educational component.   See, e.g., Julia Hall, Greek Life Faces Challenges, Sanctions, Maine Campus, May 9, 2002, (Docket # 89-8) ("According to Fiacco, the sanctions are designed to be educational and to help the organizations learn from their mistakes and prosper.  He said Judicial Affairs is not 'out to get' the Greek community, the sanctions were imposed to help them modify their procedures and protocols within the house to reduce the risk to the organizations.").

In short, as the Director of Judicial Affairs, Fiacco's position entailed access to the media.[9]  The Court finds Fiacco's assertion that he did not reach out to the media, and thus could not avail himself of self-help unpersuasive.  Although Fiacco chose not to reach out to the media, that does not necessarily mean that he did not have the requisite access to the media.  Given Fiacco's frequent appearance in the Maine Campus, he was in a position to avail himself of self-help through the media if he chose.

The final factor in determining whether Fiacco is a public official is "the risk of diminished privacy assumed upon taking the position."  Mandel, 456 F.3d at 204.  This final consideration acknowledges that "[p]ersons who actively seek positions of influence in public life do so with the knowledge that, if successful in attaining their goals, diminished privacy will result."  Kassel, 875 F.2d at 940.  Although not the classic case of the aspirant to elective office, Fiacco voluntarily assumed a position with inherent importance over issues of concern to the university community and broad exposure to that community.  Fiacco's position entailed interaction with the media and outreach to the

---

[9] Fiacco's access to the media also distinguishes him from the plaintiff in Kassel where the First Circuit found that: "[Kassel's] position commanded no extraordinary media exposure.  His duties did not involve answering press inquiries; quite to the contrary, the VA employed its own media liaison person."  Kassel, 875 F.2d at 941.

community.   As the Director of Judicial Affairs charged with promulgating policy, investigating allegations, conducting hearings, and issuing disciplinary sanctions, Fiacco's position was "one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy."   Rosenblatt, 383 U.S. at 86 n.13.   In short, he was frequently and actively in the public eye at the University of Maine in Orono.

From the ample record before the Court, Fiacco qualifies as a public official.   The Director of Judicial Affairs, who has the ability to investigate, adjudicate and sanction students and organizations and promulgate policies, possesses a position of influence over issues of public importance.   The position requires and entails access to the media. Thus, the First Amendment guards discussion of the person holding the position. Therefore, the Court finds that in order to recover for intentional infliction of emotional distress, Fiacco must show that false statements of fact were made with "actual malice." See Hustler Magazine, 485 U.S. at 56.

### ii.    Public Figure

Even if the Court found that Fiacco were not a public official, the Court would nonetheless find that he is a limited-purpose public figure.   Individuals generally become public figures in one of two ways:[10] "(1) when persons 'assume[] roles of especial [sic] prominence in the affairs of society,' perhaps by occupying positions of persuasive power and influence,' or (2) when persons 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" Pendleton v. City of Haverhill, 156 F.3d 57, 67 (1st Cir. 1998) (quoting Gertz, 418 U.S.

---

[10] An individual can also become a public figure "through no purposeful action" of his or her own, "but the instances of truly involuntary public figures must be exceedingly rare."   Gertz, 418 U.S. at 345.

at 345).  In addition, a person can be classified as either a public figure for all purposes or "only for a limited range of issues."[11]   Gertz, 418 U.S. at 351.  Where an individual plaintiff falls on this scale is determined "by looking to the nature and extent of an individual's participation in the particular controversy."  Id. at 352.

In determining whether an individual qualifies as a public figure, courts generally engage in a three step analysis, which is necessarily fact-bound.  See e.g., Pendleton, 156 F.3d at 68-70; Norris, 53 F. Supp. 2d at 503-05.  First, the Court must evaluate whether a public controversy existed prior to the publication.  Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 590 (1st Cir. 1980); Norris, 53 F. Supp. 2d at 503.  This Court has previously established three maxims with regard to what qualifies as a public controversy: "purely private disputes do not give rise to public controversies, the implications of the controversy in question must affect the public and not merely the litigants, and the public importance of the issues involved must be considered."  Norris, 53 F. Supp. 2d at 503.

In Pendleton v. City of Haverhill, a preexisting public controversy existed where a newspaper article detailed the growing concern among public school students that racial minorities were underrepresented among public school teachers.  Pendleton, 156 F.3d at 60, 68-69.  Similarly, in this case, the newspaper articles on the record before the Court evidence that a public controversy existed regarding the disciplinary process at the University of Maine in Orono prior to the fall of 2002.  Arguably, individual disciplinary proceedings are private, as they involve the conduct officer and the student or organization.  Nonetheless, "[t]he mere fact that the immediate proceeding is between

---

[11] There is no claim that Fiacco is a public figure for all purposes.  The Court thus proceeds to determine whether Fiacco is a limited-purpose public figure.

private individuals, however, does not guarantee that there could be no public controversy." Bruno & Stillman, Inc., 633 F.2d at 590.  During this time period, Maine Alpha was involved in the Judicial Affairs process, but the debate encompassed more than SAE: it involved other fraternities, students and the University of Maine community at large.  Articles from the Maine Campus demonstrate that the student disciplinary process at the University had become a matter of public concern.  See, e.g., Aimee Dolloff, Students Held to Higher Standard: Conduct Code, Judicial Affairs Judge Students' Actions, Maine Campus, Nov. 5, 2001 (Docket # 89-6); Aimee Dolloff, Sigma Nu Fraternity Faces Sanctions: Past, Recent Student Conduct Code Violations Prosecuted, Maine Campus, April 18, 2002, (Docket # 89-7); Julia Hall, Greek Life Faces Challenges, Sanctions, Maine Campus, May 9, 2002 (Docket # 89-8); Aimee Dolloff, Judicial Affairs Clarifies Consequences, Maine Campus, Sept. 23, 2002 (Docket # 89-10).

Next, the Court must consider whether Fiacco voluntarily injected himself into the controversy.  This requires looking "to the nature and extent of [the plaintiff's] participation in the particular controversy . . . ."  Bruno, 633 F.2d at 591 (quoting Gertz, 418 U.S. at 352).  Here, Plaintiff asserts that he did not voluntarily inject himself into the controversy.  Rather, assuming that a controversy exists, "Plaintiff would have been involuntarily involved by virtue of his employment position. . . . It was his job to be involved in student disciplinary issues; he did not voluntarily thrust himself into a controversy to influence the outcome."  (Pl.'s Br. in Resp. to the Court's Order Requesting Additional Briefing (Docket # 90) at 11-12).  This argument misconstrues the "voluntariness" requirement.

In <u>Lohrenz v. Donnelly</u>, a public controversy existed about the appropriateness of women serving in combat roles in the United States military.  <u>Lohrenz v. Donnelly</u>, 350 F.3d 1272, 1275 (D.C. Cir. 2003).  After completing the appropriate training, Lt. Carey Dunai Lohrenz became one of the first women to pilot armed forces combat aircraft.  <u>Id.</u> at 1274-75.  The Court of Appeals for the District of Columbia found that she voluntarily injected herself into the controversy by choosing combat aircraft, assuming the risk of a combat assignment and then becoming one of two American women combat pilots.  <u>Id.</u> at 1282.

> Once she "chose...combat aviation" by indicating her preference for the F-14 while knowing of the preexisting public controversy over the appropriateness of women in combat positions, Lt. Lohrenz assumed the risk that if she succeeded in qualifying for a combat assignment and the Navy made such an assignment, she would find herself at the center of the controversy as a result of the special prominence that she and only one other woman combat pilot attained upon receiving their F-14 assignments.

<u>Id.</u> at 1280.  Similarly, in <u>Norris v. Bangor Publishing Co.</u>, where a political consultant claimed defamation, this Court stated: "Plaintiff voluntarily accepted a job researching a candidate for national office on behalf of a national political organization.  He cannot be described as an 'unwilling[]' participant . . . ."  <u>Norris</u>, 53 F. Supp. 2d at 504.  Even though Fiacco may not desire to be a public figure, he voluntarily accepted the position of Director of Judicial Affairs.  The nature of the position thrust Fiacco into the public controversy surrounding the student disciplinary process.  As with the plaintiffs in <u>Lohrenz v. Donnelly</u> and <u>Norris v. Bangor Publishing Co.</u>, Fiacco injected himself into the public controversy by accepting a position at the center of the controversy.

As with "public official" analysis, an additional consideration for the Court is whether Plaintiff had greater access to the media as a means of self-help.  "Public

officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." Gertz, 418 U.S. at 344. In Pendleton v. City of Haverhill, Pendleton had the requisite access to the media "as evidenced by the fact that his arrest on cocaine charges made the front page of both the Gazette and the Eagle-Tribune well prior to the uproar over his exoneration." Pendleton, 156 F.3d at 70. Thus, even though Fiacco may not have availed himself of self-help via the media, his prior exposure and numerous appearances in the Maine Campus demonstrate that he had the requisite access to the media to qualify as a limited-purpose public figure. Therefore, the Court alternatively finds that Plaintiff Fiacco qualifies as a limited-purpose public figure and is required to prove that false statements of fact were made with actual malice in order to recover for intentional infliction of emotional distress.

### iii.    False Statement of Fact

As a public official or limited purpose public figure, Fiacco must first establish that the statements within the transmittal contained a false statement of fact in order to recover for intentional infliction of emotional distress.[12] Hustler Magazine, 485 U.S. at 56. The "false statement of fact" requirement contains two components: (1) the statement must be an assertion of fact, and (2) the statement of fact must be false.

Generally, statements of opinion are not actionable. "[O]nly statements that present or imply the existence of facts that can be proven true or false are actionable . . . ." Gray v. St. Martin's Press Inc., 221 F.3d 243, 248 (1st Cir. 2000); see also Levinsky's,

---

[12] Although Fiacco initially asserted that there were false statements in the documents, he no longer pursues that claim.

127 F.3d at 130 (stating that "[t]he vaguer a term, or the more meanings it can reasonably convey, the less likely it is to be actionable."). In <u>Levinsky's, Inc. v. Wal-Mart Stores, Inc.</u>, the manager of a Wal-Mart's store described a competitor's store as "trashy." <u>Levinsky's Inc.</u>, 127 F.3d at 125-26. The First Circuit declined to allow liability for defamation to rest on that statement, asserting: "The word 'trashy' is a chameleon that continuously changes colors and shades of meaning. It admits of numerous interpretations. We can imagine no objective evidence that might conclusively prove or disprove it." <u>Id.</u> at 130. Further, whether a statement is labeled as verifiable fact or as opinion is a matter of law for the court. <u>Gray</u>, 221 F.3d at 248.

The first sentence of the cover memorandum undeniably asserts three objectively verifiable statements: (1) Fiacco has had legal difficulty with DWI; (2) Fiacco has had legal difficulty with sexual harassment; and (3) Fiacco has had legal difficulty with domestic violence. Conversely, the question: "Is this honestly the best qualified candidate that the University of Maine could find for the <u>Office of Judicial Affairs</u>?" is an opinion that cannot be verified. The term "best," like the term "trashy," is subject to numerous meanings and qualifications. The Court is unable to discern the precise meaning of the question and therefore cannot begin to determine whether it is true or false. Thus, liability will not lie based upon the question. Rather, the Court limits its analysis to the assertions of fact found in the first sentence. This requires the Court to first elucidate the concept of falsity.

Minor inaccuracies and small alterations will not render a statement false. <u>See</u> <u>Masson v. New Yorker Magazine Inc.</u>, 501 U.S. 496, 517 (1991) (stating that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the

libelous charge be justified." (internal quotations omitted)).  Rather, a "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Id. (internal quotations and citations omitted).  It is immaterial whether the minor inaccuracies are deliberate; the statement is not false so long as there is no "material change in the meaning conveyed by the statement." Mangual v. Rotger-Sabat, 317 F.3d 45, 68 (1st Cir. 2003).

The first statement of fact in the memorandum asserts that Fiacco has had past legal difficulties with DWI.  Although the memorandum does not state what DWI abbreviates, the logical inference is "Driving While Intoxicated."  Fiacco claims that he has never been convicted of "Driving While Intoxicated" and the statement is therefore false.  Fiacco was, however, charged and convicted of Driving While Ability Impaired while he had a blood alcohol level of .089 percent.  By way of illustration only, in Maine a person is guilty of Operating Under the Influence when he or she has a blood alcohol content of .08 percent or if his or her mental or physical faculties are impaired to any extent.  29 M.R.S.A. § 2411; see also Maine v. Bradley, 658 A.2d 236, 237 (Me. 1995).  The memorandum may have contained the minor inaccuracy of mislabeling the offense, but the underlying gist is the same: a person drove a vehicle with a prohibitively high level of alcohol in his or her system.  Therefore, the Court finds that the first assertion is substantially true and cannot serve as a basis for liability.  Furthermore, the Court finds it significant that included with the memorandum were numerous documents that detailed the offense of which Fiacco was found guilty.  The inclusion of these documents allowed

the reader to make an independent determination of the truth or falsity of the assertions in the memorandum.[13]

Second, the memorandum asserts that Fiacco has had past legal difficulties with sexual harassment.  During the course of extensive discovery, Fiacco acknowledged that he had been involved with a sexual harassment complaint, presumably during his prior employment in Colorado.[14]  In addition, Fiacco admitted that he handed Kelly Weaver, a former girlfriend whom he worked, the book The Gift of Fear[15] and also violated work place restrictions placed upon him.  Fiacco has also stated that "the nature of [papers he placed on Weaver's desk] might indicate possibilities of harassment in the workplace . . . ."  (Docket # 60 at 25).  Without deciding, the Court notes a reasonable person could conclude that Fiacco's actions created a hostile work environment.  See, e.g., Gorski v. New Hampshire Dep't of Corrs., 290 F.3d 466, 472 (1st Cir. 2002).  Thus, the record before the court reflects that Fiacco has had past legal difficulties with sexual harassment, and the statement, therefore, was not false and cannot serve as the basis for liability.

The final assertion of fact in the memorandum claims that Fiacco has had past legal difficulties with domestic violence.  Fiacco claims that he "has never been accused or convicted of 'domestic violence,' commonly defined as taking violent or physical actions toward another person who is a member of his household."  (Pl's Br. in Resp. to the Court's Order Requesting Additional Briefing (Docket # 90) at 13).  Nonetheless,

---

[13] Included with the memorandum were court documents detailing Fiacco's change of plea to guilty for Driving While Ability Impaired.  (Docket # 60 at 29-36).  In addition, there is a memorandum from the Probation Department informing the Court of La Plata County, Colorado that Fiacco had fulfilled the requirements for a deferred judgment.  (Docket # 60 at 30).

[14] During the course of his deposition, Fiacco stated: "I explained that I had been charged for DWAI in [the] state of Colorado.  I explained what the resolution was.  I also explained the circumstances regarding the sexual harassment complaint, and, yeah, that's essentially it."  Fiacco Dep. 28:13-29:4. (Docket # 84-2 at 7 & Docket # 56-2 at 4).

[15] The book, The Gift of Fear, describes violent acts, how to recognize signals and avoid potentially violent situations.  (Docket # 60 at 24).  Weaver described the book as "a stalking book."  (Id. at 66).

Fiacco admits that he was the defendant in <u>Weaver v. Fiacco</u> and was subject to a temporary restraining order pursuant to the Colorado Domestic Abuse Act, §14-4-101 <u>et seq</u>. While the issuance of the permanent restraining order was overturned on appeal, the Court considering the appeal found that there was evidence to support the conclusion that the Defendant, Fiacco, had committed an act of domestic abuse. (Docket # 60 at 9).

Furthermore, the Court notes that domestic violence encompasses more than "physical" violence towards a member of the household. For example, Maine defines "abuse" as including "[a]ttempting to place or placing another in fear of bodily injury through any course of conduct, including, but not limited to, threatening, harassing or tormenting behavior," 19 M.R.S.A. § 4002(1), and "family or household members" includes former domestic partners who no longer reside together, <u>Id</u>. § 4002(4). Given that Fiacco was subject to a temporary restraining order pursuant to Colorado's Domestic Abuse Act, the assertion that he has had legal difficulties with domestic violence is not false. The Court is therefore left with no false statements of fact on which to base liability for intentional infliction of emotional distress. Even if the Court found false statements of fact, there is no evidence of actual malice.[16]

No genuine issues of material fact survive with regard to the claim for intentional infliction of emotional distress. Fiacco has failed to "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue" sufficient to overcome the heightened standards for intentional infliction of emotional distress imposed by <u>Hustler Magazine v. Falwell</u>, 485 U.S. 46 (1986). <u>See</u> <u>Triangle Trading Co.</u>, 200 F.3d at 2 (citation and internal punctuation omitted). The Court is satisfied on the record before

---

[16] Indeed, when private investigator Kraft compiled the documents, he spoke with individuals mentioned in the newspaper articles to determine the accuracy of the facts within the articles.

it that the First Amendment and <u>Hustler Magazine v. Falwell</u>, 485 U.S. 46 (1988), preclude recovery. [17]

Even if the First Amendment did not prevent recovery on this cause of action, the dissemination of truthful, publicly available documents is not sufficiently outrageous to permit recovery.  In order to recover for intentional infliction of emotional distress, the conduct must have been "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community." <u>Champagne</u>, 711 A.2d at 847.  Further, "it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so." <u>Id.</u>  Here, the anonymous publication of a memorandum and documents to various members of the community may have been a callous, insensitive and juvenile course of conduct, but the jury could not find that it was "so extreme and outrageous as to exceed all possible bounds of decency in a civilized community." <u>Id.</u>  Therefore, the Court GRANTS summary judgment  in favor of Defendant SAE on the claim of intentional infliction of emotional distress.

**B.    Civil Conspiracy**

Turning to Count II, Fiacco asserts a claim for civil conspiracy.  Generally, civil conspiracy is not an independent tort in Maine. [18]  <u>Cohen v. Bowdoin</u>, 288 A.2d 106, 110

---

[17] The Court notes the disconnect in imposing the standards for defamation on a case for intentional infliction of emotional distress.  As Justice White said in his concurrence: "As I see it, the decision in <u>New York Times v. Sullivan</u>, 376 U. S. 254 (1964), has little to do with this case. . . . But I agree with the Court that the judgment below, which penalized the publication of the parody, cannot be squared with the First Amendment." <u>Hustler Magazine</u>, 485 U.S. at 57 (White, J., concurring).

[18] In <u>Cohen v. Bowdoin</u>, the Law Court recognized that

in particular extraordinary circumstances there has been recognized the existence of a separate self-sufficient and independent tort of 'conspiracy', as a substantive basis of civil liability, when it is shown that combination and the force of numbers inject a special and unique factual overlay of some additional element worthy of recognition as a basis

(Me. 1972)  "'[C]onspiracy' fails as the basis for the imposition of civil liability *absent the actual commission of some independently recognized tort*; and when such separate tort has been committed, it is *that tort*, and not the fact of combination, which is the foundation of the civil liability."  Id.; see also Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell, 708 A.2d 283, 286 (Me. 1998).  Therefore, if any of the tort claims survive the Motion for Summary Judgment, that tort, and not civil conspiracy, will serve as the basis for liability.  Consequently, summary judgment in favor of SAE is appropriate on Count II.

## C.      Prima Facie Tort

In Count III of his complaint, Fiacco asserts a cause of action for prima facie tort. Neither the Law Court nor this Court has recognized a cause of action for prima facie tort under Maine law.  See Harmon v. Harmon, 404 A.2d 1020, 1023 (Me. 1979) (comparing the development of the tort of wrongful interference with business relations to prima facie tort, yet failing to recognize prima facie tort as a cause of action in Maine).  Plaintiff acknowledges this in his Response.  (See Pl's Opp. To Def.'s Mot for Summ. J. (Docket # 71) at 25-26).  Nonetheless, Plaintiff encourages this Court to recognize the tort by simply citing to one Maine Superior Court case that looks to Missouri law for the elements of prima facie tort.  See Holland v. Sebunya, 1999 Me. Super. LEXIS 139, *12 (Me. Superior Ct. May 11, 1999) (assuming that plaintiff had intended to establish prima

---

for the imposition of tort liability (such as, for example, coercion, undue influence or restraint of trade) and which would be absent were the conduct to be undertaken by one person acting alone.

Cohen, 288 A.2d at 110.  Plaintiff has failed to "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue" showing extraordinary circumstances.  See Triangle Trading Co., 200 F.3d at 2 (citation and internal punctuation omitted).  Furthermore, the Court's research failed to unearth a case where a court in Maine affirmatively applied this narrow exception to allow recovery for civil conspiracy.

facie tort rather than malicious intent to injure and declining to find that plaintiff had established prima facie tort).  This Court finds that the Law Court would not recognize a cause of action for prima facie tort.  Accordingly, SAE is entitled to summary judgment on Count III.

### D.    Negligent Infliction of Emotional Distress

Count IV asserts a cause of action for negligent infliction of emotional distress. In order to recover for negligent infliction of emotional distress, Plaintiff must establish "either a unique relationship between the plaintiff and the defendant, or an underlying tort."  Richards v. Town of Eliot, 780 A.2d 281, 293 (Me. 2001).  The Law Court has found the requisite unique relationship and corresponding duty among physicians and patients, see Bolton v. Caine, 584 A.2d 615, 618 (Me. 1990), between a hospital and the family of the deceased, see Gammon v. Osteopathic Hosp. of Maine Inc., 534 A.2d 1282, 1285 (Me. 1987), and between a psychotherapist and a patient, see Rowe v. Bennett, 514 A.2d 802, 806-07 (Me. 1986).  The Law Court, however, has declined to find the requisite relationship between a police officer and an arrestee, see Richards, 780 A.2d at 293, and between a church and its members, see Bryan R. v. Watchtower Bible & Tract Society of New York, Inc., 738 A.2d 839, 849 (Me. 1999).  Plaintiff asserts that "a duty to act reasonably arose when SAE took on the role of investigating Fiacco and reporting issues of concern to the public."  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. (Docket # 71) at 28).  Plaintiff, however, has failed to proffer any evidence or cite any cases in support of finding the requisite duty.  The Court declines to find that there is a unique relationship between Defendant and Plaintiff.[19]  In addition, no tort claim remains

---

[19] The determination of whether the requisite duty is present is an issue of law for the Court to decide. Curtis v. Gagne Porter, 784 A.2d 18, 25 n.15 (Me. 2001).

on which to base liability for negligent infliction of emotional distress.  Thus, SAE is entitled to summary judgment on Count IV.

**E.      Punitive Damages**

Under Maine law, punitive damages are not a separate and distinct cause of action.  Rather, it is a type of remedy.  See Southport Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 64 (1st Cir. 2000); Connors v. Town of Brunswick, 2000 U.S. Dist. LEXIS 12253, *40 (D. Me. Aug. 16, 2000) ("[A] claim for punitive damages does not constitute a separate and distinct cause of action and that the defendants are entitled to summary judgment as to Count VI on that ground alone.").  Because none of Plaintiff's causes of action survive and punitive damages do not constitute a separate cause of action, Defendant is entitled to summary judgment on Count V.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED (Docket # 54).



**SO ORDERED.**

                              /s/ George Z. Singal
                              Chief United States District Judge

Dated at Portland, Maine, this 5th day of April, 2007.